Angelo Dewell BRANCH, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–89–00107–CR.

Court of Appeals of Texas,
El Paso.

July 12, 1989.

Rehearing Denied Aug. 9, 1989.

Warren N. Abrams, Cas Dunlap, Dallas, for appellant.

Pamela Sullivan Berdanier, Asst. Dist. Atty., Dallas, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

## OPINION

FULLER, Justice.

This is an appeal from a conviction for murder. The jury assessed punishment at fifty years' imprisonment. We affirm.

Point of Error No. One alleges an impermissible use of peremptory challenges by the State in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The issue was properly preserved in the trial court by timely objection and hearing. The Appellant is a black male. There were six (perhaps seven) black panel members who were within range of potential service on the petit jury. All were subjected to peremptory challenge by the State. The trial judge ruled that the defense had established a prima facie case under *Batson* and conducted a hearing at which the prosecutor presented neutral explanations of his strikes. The judge accepted the explanations and overruled the defense objection. We have examined the evidence in a light most favorable to the judge's ruling to determine if there was sufficient evidence upon which he could base his conclusion that the State's strikes were not racially motivated. *Keeton v. State*, 749 S.W.2d 861, 870 (Tex.Crim.App. 1988). We note that both the threshold and ultimate burdens of proof are upon the defendant to demonstrate a *Batson* violation. We are mindful that apparently neutral explanations are not to be automatically accepted at face value. The opinion in *Keeton* provides a variety of criteria for evaluating the credibility of such explanations. Of primary concern to any trial or appellate court in these situations are those explanations which are least susceptible to objective evaluation and which are, therefore, most ripe for abuse and subterfuge. Within this category are "bad vibration" explanations, attitudinal evaluations based in whole or in part upon non-verbal behavior which the trial judge may or may not observe, but which may rarely be confirmed or refuted in an appellate record. At the same time, we point out that anyone who has ever participated in jury selection knows full well the significant extent to which intangibles and non-verbal behavior contribute to the attorneys' decisions. The process falls somewhere between science and superstition and it is a rare jury which is selected without the influence of the lawyers' highly personalized notions of good and bad luck, their "seat of the

pants" psychological insights, and their favorable and unfavorable anecdotal experiences. Not every strike based on such explanation can be summarily disbelieved; they simply merit closer scrutiny under the criteria suggested in *Keeton*. Even more than the trial judge who is at least an eye and ear witness to the process, the appellate court is relegated to watching for tell-tale patterns of explanation which dove-tail suspiciously with an objective pattern of strikes. For example, greater suspicion is cast when all six minority panel members are struck and the only explanations offered are of the intangible, "bad vibration" type. On the other hand, there is less justification for discrediting the explanations when objective rationales are offered in a majority of the strikes and only isolated resort is had to intangible explanations. This is particularly true when, under *Keeton*, the same balance is reflected in the treatment of the non-minority panel members. Each case, of course, must be evaluated on its own record, and it is not the direct credibility assessment of the appellate court which prevails. The question on appeal is the sufficiency of the evidence to support the trial judge's credibility assessment.

■ We note at the outset, an evidentiary problem which will no doubt increase in significance as *Batson* complaints proliferate in the courts. In this case, the defense and the State disagreed as to the ethnic background of Panel Member No. 34, Jacqueline Stephens, the defense contending she was black and the State that she was not. Of course, no one asked her. Considering the ultimate burden of proof, the record fails to support a complaint as to this juror. In the absence of State stipulation, cases may arise in which even the defendant's prima facie showing under *Batson* will necessitate affirmative evidence of racial background. Even if Stephens were shown to be black, the State's explanation for her strike was readily creditable. She was a clinical psychologist who had recently testified as a defense expert in a criminal case—a somewhat less than ideal juror from a State perspective, regardless of race.

Before addressing the remaining strikes, we point out one additional procedural difficulty. It is apparent from the comments of counsel that a "paper voir dire", information sheets filled out by the panel members, had been prepared and utilized by both sides in questioning the prospective jurors. These sheets were not made part of the appellate record. Some of the prosecutor's explanations are implicitly based upon information on those sheets. It is of little consequence in this case, because the defense did not (and does not now) contest the existence of the facts purportedly relied upon by the State, arguing instead that these factors were exploited by the State to conceal an underlying racial motivation.

■ The prosecutor stated that he struck Juror Allen because she had a prior misdemeanor weapon conviction which she did not disclose during the oral voir dire. Juror Peace was struck on the basis that he wore a beard, changed jobs frequently and had held his current job for only six months. When challenged as to the beard rationale, the prosecutor stated that there was only one other bearded panel member but that he did not need to strike him because he was beyond the numerical range of potential seating on the petit jury. Juror Alexander had a cousin convicted of aggravated robbery and was therefore struck. These are objective bases which would logically induce any prosecutor to exercise a peremptory challenge regardless of the ethnic background of the named panel members. Evaluating these explanations in light of the treatment of the entire panel, we find no "red flags" under the criteria suggested in *Keeton*.

■ As we turn to the other strikes, we find rationales becoming more subjective. With regard to jurors Simms and Gardner, the prosecutor was concerned with the degree to which they exhibited sympathetic responses to defense counsel's voir dire comments. The prosecutor at least identified the particular voir dire issues in which these responses were detected—with Simms the issue was the unknown nature of the instrument used to cause death, with Gardner it was the issue of reliability of

eyewitness identification. Only in one instance did the prosecutor offer a purely subjective explanation, based upon non-verbal behavior and not connected to any specific voir dire issue which would be of particular significance during the ensuing trial. The prosecutor stated that juror Harrison appeared to be in a bad mood and actively avoided eye contact with him. Thus, including Stephens, out of seven strikes, the State offered four objective, credible explanations for exercising peremptory challenges. Two strikes were justified on the basis of subjective evaluations of both verbal and non-verbal behavior, but were linked to specific voir dire issues which would prove to be of particular importance given the nature of the indictment and the evidence to be offered by the State. In only one instance out of seven was the explanation purely subjective, purely based upon non-verbal behavior of the juror and without reference to any particular issue or objective criteria. We do not, of course, foreclose the possibility of proving a *Batson* violation on the basis of one strike, but the absence of a discernible pattern of abusable excuses certainly favors the trial judge's ruling and increases the defendant's practical burden to make a liar out of the prosecutor. In any event, the primary decision, as to the credibility of the prosecutor's neutral explanations, rests with the trial judge, and there is sufficient unrebutted evidentiary basis in the present record to support his decision.

Point of Error No. One is overruled.

In Point of Error No. Two, Appellant contends that he was subjected to an illegal arrest which resulted in a polaroid photograph of him being used in a photographic lineup at which an identification was made by State's witness Gear. The State argues that the detention did not amount to an arrest and was therefore not illegal. This assertion flies in the face of the trial court's express belief that Appellant was under arrest, amply supported by the handcuffing described by Appellant and admitted by the officer. Nonetheless, the issue has not been preserved for appellate review. Appellant filed and obtained a hearing on a pretrial motion to suppress in-court identification, claiming taint due to a suggestive pretrial photographic array. Appellant did not present any complaint as to fruits of an illegal arrest. Witness Gear testified as to his identification of Appellant's photograph and made an in-court identification without objection on this basis. The photograph itself was introduced with the only objection referring to the previous complaint of unduly suggestive pretrial photographic array. Illegality of arrest was not raised until two witnesses later. In the absence of a trial objection which comports with the point of error raised on appeal, the issue of admissibility of the challenged evidence is waived. *Crocker v. State*, 573 S.W.2d 190 (Tex. Crim.App.1978). Point of Error No. Two is overruled.

■ Point of Error No. Three complains of the court's refusal to deliver three requested jury instructions or definitions: (1) an instruction under Tex.Code Crim.Pro. Ann. art. 38.23 (Vernon Supp.1989) concerning disregard of evidence produced by illegal arrest; (2) an instruction under Tex. Penal Code Ann. sec. 6.04(a) (Vernon 1974) concerning concurrent causation; and (3) a definition of death under Tex.Rev.Civ.Stat. Ann. art. 4447t (Vernon Supp.1989). Appellant was not entitled to the first instruction due to the waiver of complaint addressed in Point of Error No. Two. The second and third requests were apparently founded upon the medical records of the deceased from emergency admission to pronouncement of death, State's Exhibit No. 44. The exhibit was not incorporated in the appellate record, and we are therefore unable to assess the propriety of the requested instruction and definition on that basis. Compare *Nethery v. State*, 692 S.W.2d 686, 689 (Tex.Crim.App.1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986).

Even in the absence of these records, however, a common sense assessment of the other evidence would preclude the applicability of Section 6.04. An accused may be exonerated under the statute only if his conduct alone was clearly insufficient to produce the result *and* the concurrent

cause clearly sufficient, operating alone, to do so. In the absence of the injury inflicted by the Appellant, the deceased would not even have been placed on a life-support system. If for some reason an uninjured person were placed on artificial ventilation, a removal of that aid would hardly be expected to cause death. The only testimony as to cause of death came from the pathologist, Dr. Weiner, who had access to the medical records in arriving at his conclusion. He attributed death to blunt trauma injury to the back of the head, with resulting brain injury. The death definition was requested ancillary to the Section 6.04 request. The latter having been properly refused, the definition was also properly declined.

Point of Error No. Three is overruled.

█ Point of Error No. Four challenges the sufficiency of the evidence in two respects. The concurrent causation argument is without merit for the reasons previously stated. Of greater significance is the suggestion of a fatal variance between pleading and proof as to the nature of the instrument used to inflict the injury. Gear testified that he saw the Appellant strike the deceased in the back of the head with a Burger King paper sack. By the time he reached the victim's side, the Appellant had fled. A Burger King sack was next to the victim's head. When the paramedics arrived, they moved the sack to administer aid. Gear heard the sack fall to the pavement and stated that it sounded like there was a rock or brick inside. He never looked into the sack. It was later taken into custody by the police and was found to contain a brick. Dr. Weiner testified that a brick would be consistent with the fatal injury inflicted. He further testified that he detected a patterned abrasion on the victim's cheek which indicated a blow with an object having at least one straight edge. Appellant's first indictment specifically alleged the use of a brick. The trial was conducted upon a reindictment which alleged "an object, the exact nature and description of which is unknown to the Grand Jurors."

Both sides agree that, under the reindictment, the State was required to prove that the grand jurors exercised due diligence in attempting to ascertain the nature of the criminal instrumentality. *Jordan v. State*, 520 S.W.2d 388 (Tex.Crim.App.1975). If the evidence at trial does now show with certainty what type of instrument was used then a prima facie satisfaction of such burden exists. *Scott v. State*, 732 S.W.2d 354 (Tex.Crim.App.1987). If the evidence at trial reflects that no further investigative effort by the grand jury would have led to greater certainty, then the actual failure of that body to make such effort is harmless and no variance will be found. *Polk v. State*, 749 S.W.2d 813, 817–818 (Tex.Crim.App.1988). This leads us to the question of what degree of certainty, what type of proof, must be available to require the pleading of a specific object. We have concluded that in the absence of direct evidence, the grand jury is not required to speculatively plead an instrument which the State would find virtually impossible to prove beyond a reasonable doubt. If the nature of the object can only be arrived at by circumstantial evidence, then an "object unknown" averment may be employed. See *Simon v. State*, 488 S.W.2d 439 (Tex. Crim.App.1972); *Brown v. State*, 704 S.W.2d 506, 508 (Tex.App.—Dallas 1986, PDRR); *Huffman v. State*, 775 S.W.2d 653 (Tex.App.—El Paso 1989, pet. filed). Consonant with the notice due a defendant, even if a precise label for the instrument cannot be directly evidenced, those characteristics of the object which are susceptible to direct proof should be included in the indictment. That complaint, however, is not before us. In this case, it is apparent that the second grand jury did not exercise due diligence. However, it is equally apparent from the evidence that no exercise of diligence on their part would have produced greater certainty as to the criminal instrument than the circumstantial evidence ultimately presented to the petit jury. No variance or insufficiency of the evidence in this regard is shown. Point of Error No. Four is overruled.

■ Point of Error No. Five asserts insufficiency of the evidence of Appellant's identification as the assailant. The argument is more appropriate for jury summation than for appellate briefing. The deficiencies pointed out in the identification evidence go to the weight and credibility assessment to be arrived at by the jury. This Court does not sit as an appellate jury. We review the evidence in a light most favorable to the verdict. Doing so, we find that Gear unequivocally identified the Appellant in court as having approached and struck the victim from behind, delivering a blow to the back of his head. Gear stated that at the time there was sufficient light from adjacent street lights to observe Appellant's features. He viewed him from the front, side and rear. For one or two seconds he was within five to seven feet of the Appellant. His overall observations lasted two minutes. Furthermore, he recognized Appellant from two prior sightings at that location. There was an ample basis for the jury to credit Gear's testimony. Point of Error No. Five is overruled.

■ Point of Error No. Six complains of improper jury argument in which the prosecutor referred to the Appellant as an "animal who pounces without warning—." An objection was unnecessarily sustained and a curative instruction unnecessarily given. In light of the spontaneous, cold-blooded brutality of this attack on a seventy-six-year-old man, the argument was well within the scope of the evidence. *McKay v. State,* 707 S.W.2d 23 (Tex.Crim.App.1985), cert. denied, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *Burns v. State,* 556 S.W.2d 270 (Tex.Crim.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). Point of Error No. Six is overruled.

Point of Error No. Seven contends that a prior judgment against Appellant for possession of tetrahydracannabinol, introduced by the State, was void because the alleged substance is not listed in the Controlled Substance Act. Tex.Rev.Civ.Stat.Ann. art. 4476–15 (Vernon 1976 and Supp.1989). The contention is without merit given Section 4.02(c)(N) of the act. *Ex parte Tipton,* 617 S.W.2d 262 (Tex.Crim.App.1981). Point of Error No. Seven is overruled.

■ In Point of Error No. Eight, Appellant complains that he was not permitted to cross-examine Officer Tolliver as to the description of the assailant contained in a police memorandum circulated three days after the offense. Appellant relies upon Tex.R.Crim.Evid. 107 and 614, as well as the rule expressed in *Gaskin v. State,* 172 Tex.Crim. 7, 353 S.W.2d 467 (1962) and the "use before the jury rule" as expressed in *Mendoza v. State,* 552 S.W.2d 444 (Tex. Crim.App.1977). The record clearly reflects that the memorandum was prepared not by Officer Tolliver but by Officer Bruton, based upon an initial description given by witness Gear to Bruton. The *Gaskin* Rule is inapplicable. Furthermore, Tolliver expressly stated that he was aware of the memorandum at the time it was issued, but did not at any later time use the memorandum to prepare for trial testimony. The State made no use of or reference to the memorandum. Rules 107, 611 and 614 are inapplicable. This was an attempt at improper impeachment of Officer Tolliver. Tolliver testified that Gear initially told him he could not tell if the assailant was clean-shaven. Bruton testified that Gear told him the assailant was clean-shaven and he issued the memorandum on that basis. In any event, the discrepancy was fully revealed before the jury. Bruton's memorandum based on his conversation with Gear may have impeached Gear, but it in no way impeaches Tolliver who had a separate meeting with Gear.

Point of Error No. Eight is overruled.

Point of Error No. Nine complains of the court's refusal to permit the cross-examination of Grand Jury Foreman Wendell Weatherspoon as to the initial indictment and the evidence upon which it was returned. The issue is moot given our disposition of the variance complaint previously addressed. In addition, we note that Weatherspoon served on the second grand jury which returned the reindictment, not the grand jury responsible for the first bill. The intended cross-examination would have elicited pure speculation.

Point of Error No. Nine is overruled.

Point of Error No. Ten asserts error in the refusal to admit a videotape reenactment of the offense prepared by a Dallas television station in connection with the Crime Stoppers Program. Appellant sought to use the tape for two levels of impeachment. First, he desired to impeach Gear and Officer Bruton as to the very existence of the tape. The trial judge did not preclude the defense from showing the existence and broadcast of the tape. He merely precluded the playing of the tape in the presence of the jury. Furthermore, Gear did not say that no such tape had been prepared and shown. He simply stated that he never saw one and did not know if one had been made. Bruton only stated that he did not believe one had been made. The existence of the tape would not impeach either witness, but in any event, the judge did not forbid proof that the tape was made and shown on the air.

■ On a different level, Appellant sought to utilize the tape to impeach Gear's identification of the Appellant. In his brief, counsel claims a desire to "aid jurors in observing a fair and accurate representation of the crime scene" and asserts that he laid the proper predicate for admission. Neither assertion is correct. The record reflects that the video portion of the tape was prepared, not at the scene of the assault, but in the parking lot of the television station. It was produced in broad daylight, although the offense occurred at dusk. The monologue was the result of two stages of editing and condensing various police reports and witness statements. The end result was a hearsay upon hearsay product which could not be fairly used to impeach any of the original participants.

Point of Error No. Ten is overruled.

■ Point of Error No. Eleven complains of the denial of a defense motion for continuance filed in mid-trial due to the absence of a defense witness, Bennie Kelly. Kelly was served with a subpoena, did appear on the first day of trial and was sworn with the other witnesses assembled. He then disappeared. The defense was unable to have an attachment executed. An overnight continuance was granted, but a second motion the next day was denied. Appellant never provided a complete address for Kelly and had no telephone number where he could be reached. The second motion for continuance admitted there was no reasonable expectation of being able to secure Kelly's attendance by any given date. At the new trial hearing, two months later, Kelly still could not be located.

We find no error in the denial of the second motion for continuance. The motion was defective for failure to aver a reasonable expectation of producing Kelly at *any* future date. *Salinas v. State*, 542 S.W.2d 864 (Tex.Crim.App.1976). Furthermore, the motion failed to assert that the absent testimony could not be procured from any other source as required by Tex. Code Crim.Pro.Ann. art. 29.07(1) (Vernon 1989). In fact, at the new trial hearing, Appellant was more explicit as to the alibi testimony which Kelly purportedly would have provided. Apparently, Kelly would have testified that at the time of the offense he and his wife were with the Appellant, eating dinner and watching a world series baseball game. Consequently, Mrs. Kelly could apparently provide the same evidence, yet no subpoena was ever issued for her. Her location and availability were not even addressed at either the trial or the new trial hearing. This Court is not prepared to assume from a silent record that she was equally beyond the diligent reach of the defense.

Point of Error No. Eleven is overruled.

The judgment is hereby affirmed.